**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

1997 INTERNATIONAL 9000 SEMI
TRUCK VIN: 1HSRUAER8VH409632,

      Defendant,

and

BRIAN A. WILSON,

      Claimant,

WENDELL SHABAZZ,

      Claimant - Appellant.

No. 10-2111
(D. N.M.)
(D.C. No. 1:07-CV-00270-LH-LFG)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Circuit Judge, **TACHA** and **O'BRIEN**, Circuit Judges.

---

[*] The parties have waived oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). This case is submitted for decision on the briefs.

This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

Wendell Shabazz, proceeding pro se,[1] appeals from the district court's judgment, following a trial, in favor of the government in a civil forfeiture proceeding. *See* 21 U.S.C. § 881(a)(4)&(6). He claims he had a valid security interest in a semi-truck, seized while transporting marijuana, and he was unaware of the owner's criminal activity. The district court concluded otherwise and rejected his claim of a valid ownership interest. We AFFIRM.[2]

## I.   BACKGROUND

On September 1, 2006, Brian Wilson was arrested for transporting marijuana in a 1997 International 9000 semi-truck (the truck) in Lordsburg, New Mexico. Following Wilson's arrest, the government filed an action for civil forfeiture of the truck.[3] Shabazz filed an answer objecting to the forfeiture. He claimed he had an ownership interest in the truck via a security interest exceeding the truck's current value.

Both the government and Shabazz filed cross-motions for summary judgment.[4]

---

[1] Because Shabazz is appearing pro se, we construe his pleadings and papers liberally but "our role is not to act as his advocate." *See Gallagher v. Shelton*, 587 F.3d 1063, 1067 (10th Cir. 2009).

[2] Our jurisdiction derives from 28 U.S.C. § 1291.

[3] Wilson eventually pled guilty to possession with intent to distribute more than 100 kilograms of marijuana. He did not challenge forfeiture of the semi-truck.

[4] The government also filed a motion to dismiss Shabazz's counterclaims for monetary damages resulting from his attempts to take possession of the semi-truck. The district court dismissed his counterclaims, concluding it had no jurisdiction under the doctrine of sovereign immunity. The dismissal of Shabazz's counterclaims is not at issue on appeal.

The government claimed the undisputed facts established the truck was used in criminal activity and Shabazz had failed to provide admissible evidence of his security interest in or innocent ownership of the truck. For his part, Shabazz claimed he loaned Wilson part of the money to purchase the truck and took a purchase money security interest in the truck to secure the loan. Attached to Shabazz's motion was his affidavit averring he had no knowledge of Wilson's criminal activity. In his response to the government's motion for summary judgment, Shabazz attached a copy of a security agreement, signed by Wilson, which purported to secure his $7,500 loan to Wilson. He also attached a "replacement" Georgia Certificate of Title, issued January 3, 2007 (several months after Wilson's arrest), showing him as a first lien holder. The district court concluded the government had established the truck was used in criminal activity and thus forfeitable. However, it denied the parties' cross-motions for summary judgment because a material issue of fact existed as to Shabazz's ownership interest.

The matter was tried to the court. Shabazz submitted two "replacement" Georgia Certificates of Title for the truck, one dated January 3, 2007, and the other October 26, 2009, naming him as first lien holder on the truck. (Supp. R. Vol. 1 at 7, Supp. R. Vol. 2 Ex. A.) Shabazz testified he had withdrawn $5,000 from his account to provide Wilson a certified check as part of the purchase money for the truck. In support of his testimony a bank statement from the account of Wendell Shabazz/Deen Realtors, L.L.C. for the month of March 2005, was admitted; it showed an electronic withdrawal of $5,000 on March 28, 2005. He also attempted to submit his affidavit filed with his summary judgment motion but the court explained it was "not an item of evidence for the issues

- 3 -

before the Court [that day]." (Supp. R. Vol. 1 at 17.)  Shabazz replied: "Okay.  So I'll give my testimony, then."  (*Id.*)  However, Shabazz did not testify further because at this point, Wilson arrived in court.  Shabazz terminated his own testimony and immediately proceeded to examine Wilson.

Wilson identified a $15,000 receipt from William Baker of Bill's Lawn and Garden Maintenance for a truck purchased on March 30, 2005.  The receipt indicated a payment of $10,000 in cash and a $5,000 certified check for the truck.  The receipt stated the truck's VIN number and mileage and noted the sale was "AS-IS."  (Supp. R. Vol. 2, Ex. B.)  Wilson testified he received the certified check and $2,500 in cash from Shabazz for the truck's purchase.  He also identified a "Note" dated March 28, 2005, from him to Shabazz.  Shabazz presented no other evidence.

On cross-examination, Wilson admitted to pleading guilty to possession with intent to distribute more than 100 kilograms of marijuana and his use of the truck to commit his crime.  The prosecutor then explored the connection between Wilson and Shabazz:

> Q.  Were you at Mr. Shabazz's house or at your house [when you signed the promissory note]?
>
> A.  . . . I was at his house . . . .
>
> Q.  How long have you known Mr. Shabazz?
>
> A.  Pretty much all my life.
>
> Q.  And your family [sic] are all friends; is that right?
>
> A.  Yes.
>
> Q.  And so you would say that . . . you and he each know each other very

well; is that correct?

A.  Yes, sir.

(Id. at 23-24.)  Wilson previously shared an address with Shabazz in New York where he lived with Shabazz, Shabazz's wife, Wilson's mother and Wilson's sister.  At some later time, both men moved to Stone Mountain, Georgia, where they resided at separate addresses when Wilson purchased the truck.  Wilson testified he had seen the truck for sale on the Internet and drove to Pennsylvania to make the purchase.

Later in the proceedings, the prosecutor established Wilson's prior trucking business, BMW Trucking, was registered at the same address in New York where he had lived with Shabazz.  When asked if he knew where Shabazz obtained the cash for the loan to Wilson, Wilson stated: "I would imagine from work [*i.e.*, Deen Realtors]."  (*Id*. at 26.)  According to Wilson, Shabazz sold real estate in Georgia.  But when the prosecutor informed Wilson that Shabazz's realty business was registered at the New York address, Wilson said he was surprised to know that.  (*Id*. at 30.)  According to Wilson, the two did not converse much about their businesses.  He stated Shabazz had never worked with him in his trucking business and they had done no other business together.  The prosecutor then returned to the nature of their relationship:

Q.  How is it you know [Shabazz]?  How did you meet him?

A.  Through my family.

Q.  Through your family, how so?

A.  He's my brother . . . .

    The Court:  He's your brother?

The Witness:  Yes.

The Court:  Mr. Shabazz is?

The Witness:  Yes.

(*Id*. at 34-35.)

The Note submitted as evidence of the loan contained several obvious irregularities.  It stated in pertinent part:

> For VALUE RECEIVED, BRIAN A. WILSON, . . . hereby covenants and promises to pay WENDELL SHABAZZ, Seventy Five Thousand Dollars ($7,500.00) . . . which principle shall be payable without interest, in thirty-six (36) monthly installments of Two Hundred Dollars and Ninety Seven Cents (244.97) each month, commencing on the 1st day of April, 2005, and finally on to the first day of March 1, 2008, one (1) payment of the remaining principal balance of $244.97 shall become due and payable.

(R. Supp. Vol. 2 at Ex. C.)  The Note also stated the loan to Wilson consisted of $2,500.00 cash and a $5,000.00 bank check (payable to William Baker) which was to be secured by a first lien on a "1997 International 9000 Series Truck."  (*Id*.)  It required Wilson to file a certificate of title listing Shabazz as a first lien holder.

When questioned about the discrepancy between the written and numeric amount owed on the Note, Wilson stated it was a "typo."  (R. Supp. Vol. 1 at 27.)  He had seen the error "but it had the correct amount right next to it in parentheses, so" he just ignored it.  (*Id*.)  Wilson stated the discrepancy in the monthly payment was also a typo, but the intent was to pay $244.97 per month.  The prosecutor pointed out that the loan purported to be without interest but, when the intended monthly payments were added together, the final reimbursement to Shabazz would exceed the loan, totaling "8,818.92."  (*Id*.)  Wilson responded, "I guess I never added it up."  (*Id*.)  The April date for the first payment was

also incorrect; Wilson said "it's supposed to say May." (*Id*. at 28.)  Wilson stated he had placed Shabazz's name on the title as first lien holder when he obtained a Certificate of Title[5] but he was not required to present the note or any proof of Shabazz's interest in order to do so.  Rather, he simply filled out the form naming Shabazz as first lien holder.[6]  Finally, Wilson conceded he had not used the services of a notary public to verify the date he signed the agreement.

As far as repayment, Wilson testified he had paid back none of the money loaned by Shabazz.[7]  When asked why not, Wilson claimed he had not done so because he "got [himself] jammed up" by "getting arrested." (*Id*. at 35.)  However, he conceded there was almost eighteen months between the time he was to begin repaying the money and the time of his arrest. (*Id*.)  He testified Shabazz called him once but took no legal action for repayment. The prosecutor then asked Wilson about the criminal activity leading to his arrest.  While Wilson could remember how much he was being paid to transport the marijuana ($15,000), he could not recall who was paying him.

---

[5] Under Georgia law, one way to perfect a security interest on a vehicle is to list the interest on the Certificate of Title.  *See* Ga. Code Ann. § 40-3-24.

[6] Georgia law requires an application for a certificate of title for a vehicle previously registered in another state to contain or be accompanied by "any . . . information and documents the commissioner or authorized county tag agent reasonably requires to establish the ownership of the vehicle and the existence or nonexistence of security interests in it and liens against it."  Ga. Code Ann. § 40-3-21(c)(1)(B).

[7] Shabazz's proposed exhibit list provided prior to trial identified five exhibits. Along with the certificates of title, the "bill of sale," the Note and the bank check, Shabazz stated he would provide "Payment Records on Note securing debt on [the] 1997 International Truck . . . ." (R. Vol. 1 at 211.)

- 7 -

The district court found there was no reliable documentary evidence of an ownership interest prior to Wilson's arrest and Wilson's testimony allegedly authenticating the Note was simply not credible. It held:

> The totality of the evidence indicates that the execution of the Note was a sham transaction that did not create a valid security interest in the Semi Truck. Claimant thus did not prove by a preponderance of the evidence that he held a legitimate leasehold, lien, mortgage, recorded security interest, valid assignment of an ownership interest, or any other legitimate ownership interest in the Semi Truck. Claimant's interest, if any, was that of a mere nominee who exercised no dominion or control over the Semi Truck. Claimant therefore failed to prove that he is an owner of the Semi Truck within the meaning of 18 U.S.C. § 983(d)(6)(A) . . . . Claimant also failed to prove that he did not know of the conduct giving rise to the forfeiture or that, upon learning of such conduct, he did all that reasonably could be expected under the circumstances to terminate such use of the Semi Truck.

(R. Vol. 1 at 229.) Because Shabazz had failed to show by a preponderance of the evidence that he held a bona fide security interest in the truck, it was subject to forfeiture.

## II. DISCUSSION

"All conveyances, including . . . vehicles . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment" of controlled substances are subject to forfeiture. 21 U.S.C. § 881(4). "[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). However, "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). "The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." (*Id.*)

In this instance, Shabazz claims he had a valid security interest in the truck at the

time the illegal conduct took place. Whether a claimant has a valid property interest is determined by the law of the state in which the ownership interest exists, here, Georgia. *See United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003). Once a valid ownership interest is shown, an innocent owner also must show he "did not know of the conduct giving rise to forfeiture; or upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. §§ 983(d)(2)(A)(i)&(ii).

There is "one important exception" when establishing innocent ownership, however. *One Lincoln Navigator*, 328 F.3d at 1015. Federal law prohibits "a nominee who exercises no dominion or control over the property" from claiming innocent ownership. 18 U.S.C. § 983(d)(6)(B)(iii).[8] "[T]hings are often not what they appear to be, especially in the world of drug trafficking." *United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1278 (11th Cir. 2010) (quotation and citation omitted). "[T]he very premise of requiring both an ownership interest and dominion or control is that people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name." *Id*. (quotation and citation omitted).

Shabazz claims the district court failed to correctly apply Georgia law regarding

---

[8] We need not determine the relative roles of state and federal law when deciding whether Shabazz is a nominee because Georgia law does not give effect to sham transactions. However, we note there is some disagreement between the Circuits on this issue. *See United States v. Nava*, 404 F.3d 1119, 1128 (9th Cir. 2005) (rejecting the approach taken in *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2001), wherein a sham transaction is a matter of federal law irrespective of whether the state would recognize the legal interest).

security agreements, disregarded his affidavit denying knowledge of criminal activity and wrongly determined Wilson's testimony was not credible. We review a district court's conclusions of law de novo. *Creative Consumer Concepts, Inc. v. Keisler*, 563 F.3d 1070, 1078 (10th Cir. 2009). We review the district court's findings of fact for clear error, applying a highly deferential standard and "giving due regard to the court's opportunity to judge the credibility of witnesses." *Id.*; *see* Fed. R. Civ. P. 52(a)(6).

Shabazz argues the court erred when it failed to apply Georgia statutory law or a constructive trust to recognize his security interest in the truck. However, the court was not required to do so once it determined the transaction was a sham and Shabazz was a mere nominee. *See One Lincoln Navigator*, 328 F.3d at 1015. Even if Georgia law were applied, however, "it is impermissible to engage in sham transactions designed to camouflage the actual situation." *Hayes v. Hayes*, 620 S.E.2d 806, 807 (Ga. 2005) (quotations and citations omitted); *see also Clay v. Oxendine*, 645 S.E.2d 553, 557 (Ga. App. 2007) ("totality of the circumstances" analyzed to determine whether transaction is sham); *see also* Ga. Code Ann. § 11-1-203 ("Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."). Thus, if the district court's factual findings are supported by the record, there was no valid agreement to which the Georgia statutory provisions cited by Shabazz would apply. Moreover, under these circumstances, Georgia law would not allow equity to provide Shabazz relief. *See Hayes*, 620 S.E.2d at 806-07.

Shabazz contends the district court erred when it found he failed to present any evidence that he did not know of Wilson's illegal activities. Specifically, he points to his

- 10 -

affidavit submitted with his motion for summary judgment claiming his lack of knowledge. But as the court explained to Shabazz during the bench trial, his affidavit was of no evidentiary consequence in the final proceeding and he was required to establish every element of his claim at trial. While Shabazz said he would testify later to his lack of knowledge of criminal activity, he never did so. As a result, the district court correctly found Shabazz failed to meet his burden of proof when he offered no evidence of his ignorance regarding Wilson's illegal activity.

Shabazz also argues the district court had no reason to find Wilson was not credible or that he attempted to hide his familial relationship with Shabazz. He claims the belated revelation that both men shared the same mother was due solely to the prosecutor's inept questions. While it is true the prosecutor's question did not directly ask if the two men were related, this did not prevent Wilson from clarifying the situation.

Even if Wilson did not deliberately mislead the court about his familial relationship with Shabazz, his credibility was suspect at numerous points in his testimony. For example, Wilson "unconvincingly" could not remember who had paid him to deliver the marijuana. (R. Vol. 1 at 225.) It is also highly questionable that brothers with no interest or knowledge of each other's business dealings before his arrest would arrange a major loan without correcting the Note's obvious errors. And perhaps most telling, Wilson's explanation for failing to make any payment for over seventeen months would strain belief for even the most credulous.

In contrast, the district court expressed solid reasons for its conclusion that the Note was a sham transaction. It pointed to the lack of proof of the date of the Note and

- 11 -

the parties' failure to correct key provisions. Shabazz's failure to take any legal steps to collect any repayment, even though his "loan" was in default for almost eighteen months is persuasive evidence he chose not to exercise dominion or control over his alleged security. *See Oxendine*, 645 S.E.2d at 558 (failure to offer any evidence of inspection of property to determine its condition at the time of the transaction or efforts to acquire possession of the property after default indicated the transaction was a sham). Even without deference to its fact finding, we would be hard-pressed to question the district court's conclusion that Shabazz was not an innocent owner of a valid security interest in the truck.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge